# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     :
    :
        v.                 :     3:17-CR-78
    :     (JUDGE MARIANI)
JUAN ROMAN-POLANCO,         :
    :
       Defendant.       :

**FILED**
**SCRANTON**

APR 0 9 2019

Per_____
DEPUTY CLERK

## MEMORANDUM OPINION
## I. INTRODUCTION

With Defendant's December 17, 2018, Motion to Withdraw Plea Agreement,

Defendant informed the Court that he no longer wanted to enter into a plea agreement and

wanted to proceed to trial on the charges set out in the March 28, 2017, Indictment. (Doc.

229 at 1-2.) The Indictment contains two counts: Count 1 – Conspiracy to Distribute and

Possess with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 846 (Doc.

22 at 1-3); and Count 2 – Possession of a Firearm by a Prohibited Person in violation 18

U.S.C. §§ 922(g)(1) and 924(a)(2) (id. at 3). By Order of January 3, 2019, the Court granted

Defendant's motion and set his trial to commence on April 16, 2019. (Doc. 232 at 2.)

Pending before the Court are several pretrial motions filed by Defendant on March

28, 2019: 1) Motion to Dismiss Indictment for Violation of Speedy Trial Act (Doc. 253); 2)

Motion to Suppress Evidence (Doc. 251 at 8); and 3) Motion for Early Disclosure of Jencks

Material (id. at 9). With his Motion to Suppress Evidence, Defendant seeks suppression of

all evidence seized from the residence at 1137 Grove Street in Avoca, Pennsylvania, and all

evidence garnered from the wiretaps of "Target Telephone Three" and "Target Telephone Six." (Doc. 251 at 8-9.) For the reasons discussed below, Defendant's motions are denied.

## II. BACKGROUND AND PROCEDURAL HISTORY[1]

Defendant's alleged involvement in the conspiracy charged in the Indictment originated with information gleaned from wiretapped interceptions of conversations on phones owned by Jose Ramon De Leon-Pineda in December 2016. (Doc. 252 at 6; Doc. 265 at 2.) On January 23, 2017, and February 24, 2017, District Court Judge Malachy Mannion approved Title III wiretaps targeting Defendant. (Doc. 265 at 2.) Kenneth Blanco, a Deputy Assistant Attorney General ("DAAG") signed off on the Title III authorizations related to this case, except for Target Telephone Six ("TT6") as to which Acting Deputy Assistant Attorney General ("ADAAG") Denise Cheung signed off. (Doc. 265 at 3-4 (citing Ex. 1 at 17, 20, 57, 60).)

In the course of the investigation, information indicated that 1137 Grove Street, Avoca, Pennsylvania, was a location related to drug activities. (Doc. 252 at 6; Doc. 265 at 4.) This was determined to be Defendant's address. (Doc. 265 at 5-6.)

---

[1] Defendant does not set out a background summary in his supporting briefs but references facts of record in the course of his arguments (see, e.g., Doc. 252 at 6) and references factual assertions contained in relevant affidavits (see, e.g., Doc. 251 at 2). The Government sets out a Factual and Procedural History in its brief opposing Defendant's suppression motions. (See Doc. 265 at 2-8). To the extent Defendant does not dispute facts averred therein, the Court cites to the factual background section of the Government's brief only to provide context for the discussion which follows. This recitation is not to be construed as findings made by the Court. Nor does the Court equate Defendant's lack of refutation with concurrence.

On March 10, 2017, intercepted communications indicated that Defendant and another individual were making a drug-related trip to New York that day. (Doc. 265 at 5.) Investigators obtained an arrest warrant and criminal complaint for both men and a search warrant for 1137 Grove Street. (*Id.* at 6.) Upon reentering Pennsylvania from New York, Defendant and his passenger were stopped and a search incident to arrest revealed a package hidden on the passenger's person and a digital scale on Defendant's person. (*Id.*) Investigators also seized Defendant's keys. (*Id.*)

One of the seized keys was a house key which was used in executing the search warrant at 1137 Grove Street. (*Id.*) The key opened the back door of the structure and provided entrance to the upstairs of the home. (*Id.* at 6-7.) Investigators' search of the area to which the key had provided access yielded the seizure of a Stag Arms AR-15 rifle with ammunition, a substance investigators believed to be used as "cut" in preparing drugs for street distribution, drug packaging materials, a money-counting machine, multiple "owe sheets" and drug ledgers, cellular telephones, surveillance equipment, documents connecting Defendant with the residence, and other evidence. (*Id.* at 7-8.)

Following his arrest, Defendant was detained pursuant to the March 10, 2017, Criminal Complaint. (Docs. 1, 10, 17.) On March 28, 2017, Defendant was indicted on the current charges which differ from those alleged in the Complaint. (Docs. 1, 22.) He entered a not guilty plea on April 6, 2017, at the initial appearance for the indictment. (Doc. 43.) On

May 10, 2017, Defendant filed his first of many motions for extensions of time to file pretrial motions which the Court granted on the same day. (Docs. 54, 55.)

On May 22, 2018, Defendant signed a plea agreement (Doc. 174 at 29) which resulted in the cancellation of his trial scheduled for June 20, 2018 (Doc. 182). By Order of July 12, 2018, following communication from Defendant to the Court and an indication that Defendant may have been unaware that he signed a plea agreement, the Court directed Defendant's privately retained counsel to confer with Defendant and report to the Court by July 20, 2018. (Doc. 194.) Subsequent events led to the Court appointment of Defendant's current counsel by Order of October 12, 2018. (Doc. 218.)

At the time current counsel was appointed, a signed plea agreement remained on the docket. (Doc. 174.) On November 30, 2018, Defendant moved for an extension of time to file pretrial motions. (Doc. 220) By Order of December 3, 2018, the Court denied the motion and set a change of plea hearing for January 3, 2019, after noting, by way of background, that "no party has moved to withdraw or set aside the signed plea agreement or informed the Court that Defendant does not intend on pleading guilty pursuant to the terms of his plea agreement." (Doc. 222 at 2-3.) The Court further directed Defendant to timely file a motion to withdraw his plea agreement if he did not wish to enter a guilty plea and informed him that, if he filed such a motion, trial would be scheduled a soon as practicable. (*Id.* at 4.)

4

Defendant filed the Motion to Withdraw Plea Agreement on December 17, 2018.

(Doc. 229.) On December 18, 2018, the Court canceled the change of plea hearing

scheduled for January 3, 2019. (Doc. 231.)

On January 3, 2019, the Court issued an Order detailing the procedural background

of the case, granting the Motion to Withdraw Plea Agreement, setting trial for April 16, 2019,

and establishing pretrial dates including the directive that motions in limine should be filed

on or before the thirtieth day before trial. (Doc. 232.) The Court's Order included the

following findings and instructions:

> 11. This Court finds that the ends of justice will be served by affording this
> continuance of trial and that such a continuation outweighs the best interests
> of the public and the Defendant in a speedy trial by affording counsel for the
> Defendant and for the Government the reasonable time necessary for effective
> preparation, taking into account the exercise of due diligence. Thus, the time
> between the date of this Order and the date of trial shall be excluded from
> speedy trial calculation pursuant to 18 U.S.C. § 3161(h).
>
> 12. Should one or both parties object to the trial date set forth in ¶ 2 [April 16,
> 2019] and believe an earlier trial date is necessary, counsel shall so notify the
> Court via letter on CM-ECF on or before January 10, 2019. (Doc. 232).

(Doc. 232 at 5-6.)

Following the issuance of this Order, Defendant filed several copies of

correspondence which Defendant had addressed to his attorney (Docs. 233-236), and

ultimately, with a letter to the undersigned docketed on February 11, 2019, he sought the

Court's assistance regarding matters raised in the correspondence (Doc. 237 (Sealed).)

On February 15, 2019, the Court issued an Order directing Defendant's counsel to file a

letter with the Court on or before February 28, 2019, responding to Defendant's letter to the Court and outlining the measures taken to address Defendant's concerns and requests. (Doc. 238.) When Defendant's counsel failed to comply with the Court's Order or otherwise communicate with the Court regarding the matters raised in the February 15, 2019, Order (Doc. 238), the Court issued another Order on March 12, 2019, ordering Defendant's counsel to show cause why he should not be held in civil contempt for failure to comply with the Court's Order. (Doc. 245 at 2-3.) The Court set a hearing on the matter for March 25, 2019. (*Id.* at 3.) In correspondence to the Court dated March 20, 2019, Defendant's counsel indicated that Defendant wanted to file pretrial motions and Defendant's counsel stated the motions would be filed within one week of the date of his letter. (Doc. 246 at 2 (Sealed).) Defendant's counsel also stated that he had recently visited Defendant at the prison and Defendant reported that he was pleased with the representation and did not have any current questions, complaints, or concerns. (*Id.*)

The show cause hearing took place on March 25, 2019. (Doc. 248.) In the course of the hearing, the Court reiterated Defendant's counsel's statement that Defendant was pleased with counsel's representation and did not have any current questions, complaints, or concerns, and Defendant confirmed that counsel's statement was true. (March 25, 2019, Unofficial Hearing Transcript "Tr. 1" at 10-11.) The Court then asked Defendant whether he was ready to go to trial and Defendant confirmed that he was. (*Id.* at 11-12.) Following this exchange, the Court turned to the matter of Defendant's counsel's indication that he was

intending to file pretrial motions by March 28th. (Tr. 1 at 11-13.) After confirming that the

Court had not granted an extension of time to file pretrial motions, the Court stated the trial

would commence on April 16th as planned and Defendant would be allowed to file pretrial

motions with supporting briefs by March 28, 2019, based on his request to do so and his

expressed ability to file the motions by that date. (*Id.* at 12-14.) The Government's counsel

was allowed five days from that date to file responses to the motions. (*Id.* at 15.)

Defendant filed the pending motions and supporting briefs on March 28, 2019.

(Docs. 251-254) Based upon review of Defendant's Motion to Suppress (Doc. 251), by

Order of March 29, 2019, the Court scheduled an evidentiary hearing for April 4, 2019.

(Doc. 255.) The Court also allowed Defendant until 5:00 p.m. on April 5, 2019, to file reply

briefs. (*Id.*)

The Government filed responsive briefs on April 2, 2019. (Docs. 264, 265.)

Defendant filed Defendant's Supplemental Brief in Support of Pretrial Motions on April 5,

2019. (Doc. 272.) Therefore, the pending motions are fully briefed and ripe for disposition.

## III. ANALYSIS

## A.   Motion to Dismiss Indictment for Violation of Speedy Trial Act

Defendant's Motion to Dismiss Indictment for Violation of Speedy Trial Act (Doc.

253) is grounded in his contention that he should have gone to trial no later than January

30, 2019. (Doc. 254 at 3.) The Government responds with evidence that the speedy trial

7

clock remains stopped with thirty-six days remaining. (Doc. 264 at 6.) The Court concludes the Government has shown that Defendant's motion is properly denied.

The Speedy Trial Act ("Act") establishes time limits for completing the various stages of a federal criminal prosecution. The information or indictment must be filed within 30 days from the date of arrest or service of the summons. 18 U.S.C. § 3161(b). The Act further provides the following:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).

The seventy-day period is subject to expansion by periods of excludable delay. *See Henderson v. United States*, 476 U.S. 321, 326 (1986). Under the Speedy Trial Act, any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excluded from the 70-day period permitted between indictment and trial. 18 U.S.C. § 3161(h)(1)(F). The provision broadly applies to all pretrial motions, whether they actually cause a postponement of trial. *Henderson v. United States*, 5 U.S. 321, 327 (1986) (exclusion is automatic). In addition, the Act provides for periods of exclusion for

> [a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government if the judge granted such continuance on

the basis of his findings that the ends of justice served by taking such action outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(8)(A). In *Zedner v. United States*, 547 U.S. 489, 506 (2006), the

Supreme Court explained that

> [t]he Act requires that when a district court grants an ends-of-justice continuance, it must "se[t] forth, in the record of the case, either orally or in writing, its reasons" for finding that the ends of justice are served and they outweigh other interests. 18 U.S.C. § 3161(h)(8)(A). Although the Act is clear that the findings must be made, if only in the judge's mind, before granting the continuance (the continuance can only be "granted ... on the basis of [the court's] findings"), the Act is ambiguous on precisely when those findings must be "se[t] forth, in the record of the case." However this ambiguity is resolved, at the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2).

*Zedner*, 547 U.S. at 506-07.

Among the non-exclusive list of factors that a district court must consider in deciding whether to grant an "ends-of-justice" continuance are the complexity of the case due to the number of defendants, the nature of the prosecution or the existence of novel issues, a defendant's need for reasonable time to obtain counsel, continuity of counsel, and effective preparation of counsel for the defendant or counsel for the government. 18 U.S.C. § 3161(h)(8)(B). As long as the court considers the factors set forth in 18 U.S.C. § 3161(h)(8)(B), it need not use the phrase "ends of justice" in the record. *United States v. Breen*, 243 F.3d 591, 597 (2d Cir. 2001).

In support of his motion, Defendant sets out the following timetable: 1) the 70-day period began to run on March 28, 2017, the date the Indictment was handed down; 2) from

March 28, 2017, until the clock was stopped on May 10, 2017, 43 days of the 70-day period elapsed (leaving 27 days before the 70-day period elapsed); 3) from May 10, 2017, to January 3, 2019, 603 days were automatically excludable based on pretrial motions filed; 4) the period ended on January 3, 2019, the date of the Order granting withdrawal of the plea; 5) this excludable time extended the trial deadline from June 6, 2017, to January 30, 2019 (based on the 27 days remaining on the 70-day period applied added to the January 3rd clock restart). (Doc. 254 at 3.) Thus, Defendant concludes that his speedy trial rights were violated when his trial did not begin by January 30, 2019. (*Id.* at 3-4.)

The Government sets out a different timetable: 1) the 70-day period began to run on April 6, 2017, the date of Defendant's initial appearance on the Indictment;[2] 2) from that date until the clock was stopped on May 10, 2017, 34 days of the 70-day period elapsed; 3) the Government agrees with Defendant that no other days elapsed from May 10, 2017, to January 3, 2019; 4) the Government contends that no days elapsed after January 3, 2019, and, therefore, the clock remains stopped with 36 days remaining. (Doc. 264 at 6-7.)

_____

[2] In identifying this date, the Government points to error in Defendant's calculation. (Doc. 264 at 6.) Specifically, the Government asserts the following:

> The complaint charged a violation of 21 U.S.C. § 841, but the indictment did not. If it had, the speedy trial clock for that charge would have started at the initial appearance for the complaint and run until May 10, 2017. As it stands, the speedy trial clock on the new charges in the indictment started running on the date of the initial appearance for the indictment, so the complaint is irrelevant to the calculation. In either event, the defendant's assertion that the clock started on March 28, 2017 with indictment ignores the statutory rule.

(Doc. 264 at 6 n.1.)

In support of the assertion that the clock remains stopped with no speedy trial violation, the Government points to the Court's January 3, 2019, Order which, as previously set out, *see supra* p. 5, included the following findings and instructions:

> 11.  This Court finds that the ends of justice will be served by affording this continuance of trial and that such a continuation outweighs the best interests of the public and the Defendant in a speedy trial by affording counsel for the Defendant and for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. Thus, the time between the date of this Order and the date of trial shall be excluded from speedy trial calculation pursuant to 18 U.S.C. § 3161(h).
>
> 12. Should one or both parties object to the trial date set forth in ¶ 2 [April 16, 2019] and believe an earlier trial date is necessary, counsel shall so notify the Court via letter on CM-ECF on or before January 10, 2019.

(Doc. 264 at 3 (quoting Doc. 232).)  The Government adds that Defendant filed no such letter.  (*Id.*)

Defendant does not present any argument to support his conclusory statement that the speedy trial clock resumed on January 3, 2019, despite the Court's Order specifically stating otherwise (Doc. 232 at 5 ¶ 11).  Nor does Defendant provide any explanation why he did not notify the Court that he believed a date earlier than April 16, 2019, was necessary if he believed January 30, 2019, was the last day his trial could begin to satisfy the Speedy Trial Act.  (Doc. 254 at 3-4.)  This failure to notify the Court disregarded the Court's explicit directive to "notify the Court via letter on CM-ECF on or before January 10, 2019." (Doc. 232 at 6 ¶ 12.)

Based on the record and the language contained in the Court's January 3, 2019,

Order, the Court concludes the Government has shown that the clock did not restart on

January 3, 2019. Therefore, Defendant is incorrect that his speedy trial rights were violated

when his trial did not begin by January 30, 2019 (Doc. 254 at 3-4), and his motion is

properly denied.

## B.    Motion to Suppress Evidence

With his Motion to Suppress Evidence, Defendant seeks to suppress all evidence

seized from the residence at 1137 Grove Street, Avoca, Pennsylvania, and all evidence

garnered from the wiretaps of "Target Telephone Three" and "Target Telephone Six." (Doc.

251 at 8-9.) The Government responds that both motions are without merit and

suppression of evidence is not warranted. (Doc. 265 at 1.) The Court concludes

Defendant's motion is properly denied.

The Court notes as a threshold matter that "[o]n a motion to suppress, the

government bears the burden of showing that each individual act constituting a search or

seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d

256, 261 (3d Cir. 2005) (citing *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir.1995).

With this burden in mind, the Court turns to the analysis of each motion.

### 1.    *Motion to Suppress Wiretaps*

Defendant seeks suppression of evidence garnered from the wiretaps of Target

Telephone Three ("TT3") and Target Telephone Six ("TT6"). (Doc. 251 at 8.) In his

12

supporting brief, Defendant states he moves to suppress all evidence garnered from the wiretap of TT3 because the wiretap was unlawful under the Fourth Amendment and Federal Wiretap Statutes for four reasons: 1) the wiretap was not supported by probable cause; 2) to the extent that probable cause supported the wiretap, that probable cause was based on the fruit of the poisonous tree of prior unlawful wiretaps; 3) the wiretap was not necessary and officers did not establish that other investigative techniques were attempted, would have been unsuccessful, or were dangerous; and 4) Assistant United States Attorney Sean Camoni's approval to conduct this wiretap was defective. (Doc. 251 at 8.) Defendant states the wiretap of TT6 was unlawful for two reasons, asserting the same necessity and approval arguments as raised regarding TT3. (Doc 251 at 9.) In his supporting brief, Defendant identified only two bases for suppression of wiretap evidence: 1) investigating officers did not establish their necessity; and 2) the authorization underlying the wiretaps was defective. (Doc. 252 at 10-11.)

Before setting out the relevant legal framework, the Court must establish the scope of the relevant inquiry presented with Defendant's wiretap motion. The motion and supporting brief are not consistent regarding the scope of the wiretap motion (*compare* Doc. 251 at 8-9 *with* Doc. 252 at 9-10), but the matter was clarified at the suppression hearing. (Tr. 2 at 4-7.) Defendant's counsel agreed that his cross-examination of the wiretap affiant regarding the veracity of the factual averments contained in the affidavit would be limited to the question of whether the factual averments in the Title III wiretap affidavit were true and

13

accurate to the best of his knowledge at the time he swore it out.[3] (Tr. 2 at 6.) Thus, the

focus of the Court's consideration of the motion to suppress wiretap evidence is whether the

necessity allegations were sufficient.

Judge Yvette Kane's opinion in *United States v. Robinson*, 513 F. Supp. 2d 169

(M.D. Pa. 2007), succinctly frames the relevant inquiry:

> Before issuing an order authorizing a Title III wiretap, it is required that "the judge determine[ ] on the basis of the facts submitted by the applicant that ... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous." 18 U.S.C. § 2518(3)(c). Title III's requirement that the Government demonstrate necessity is intended to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). The Third Circuit has emphasized that Title III's necessity requirement does not mandate that the Government exhaust all other investigative procedures before resorting to electronic surveillance. *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997). Instead, it is sufficient if there is evidence that "normal investigative techniques ... reasonably appear to be unlikely to succeed if tried." *Id.* (quoting 18 U.S.C. § 2518(3)(c)). To make such a showing, "[t]he government need only lay a 'factual predicate' sufficient to inform the [authorizing] judge why other methods of investigation are not

---

[3] At the suppression hearing, the Government's attorney, Sean Camoni, sought to clarify the scope of the evidentiary hearing. (Tr. 2 at 4.) Mr. Camoni stated that the wiretap motion relied on what was in the supporting affidavits, what was in the papers before the judge who signed them, and other legal matters-- there was no challenge in any of the motions as to the accuracy of the factual averments, the challenge was that factual averments were insufficient to support a finding of necessity. (Tr. 2 at 5-6.) Defendant's counsel, Matthew Comerford, stated that he thought a fair scope of the hearing was to inquire into the necessity of the warrants and, with respect to the January 23, 2017, warrant, to also inquire into the accuracy of the statements made in the warrant. (Tr. 2 at 4-5.) At the end of the discussion, Mr. Comerford agreed that his cross-examination of the wiretap affiant regarding the veracity of the factual averments contained in the affidavit would be limited to the question of whether the factual averments in the Title III wiretap affidavit were true and accurate to the best of his knowledge at the time he swore it out. (Tr. 2 at 6.) The Court confirmed Mr. Comerford's agreement that the scope established was sufficient and he would be allowed to cross-examine as to the veracity of the affidavit. (Tr. 2 at 6-7.)

sufficient." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (quoting *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975)). In determining whether this requirement has been satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Williams*, 124 F.3d at 418 (quoting *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989)). In this regard, "[t]he government's showing is to be 'tested in a practical and commonsense fashion.' " *McGlory*, 968 F.2d at 345 (quoting *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976)).

*Robinson*, 513 F. Supp. 2d at 174; *see also United States v. Blondell*, Civ. A. No. 3:12-cr-

0145, 2013 WL 12214142, at *5 (M.D. Pa. May 30, 2013) (citing *Robinson*, 513 F. Supp. 2d

at 174).

Here, in response to Defendant's allegation that "[t]he wiretaps are defective

because their necessity allegations are general declarations and boilerplate" and they were

not fact-specific to each wiretap at issue (Doc. 252 at 10), the Government provides the

following analysis of the affidavits and Defendant's arguments:

> In the present matter, the averments in the affidavits in support of the Title III wiretaps are similar to those found to be sufficient in *Armocida*, *Vento*, and *Williams*. The affidavits make clear that this was a multi-level, large scale drug trafficking organization. Law enforcement was looking to identify all of the members of the organization, the role that each member played in the organization, the locations of where the drugs were being stored, and the whereabouts of drug and money laundering proceeds. *See* Ex. 2 at 66 et seq.

> The affidavits exhaustively set forth numerous investigative methods that have either been tried and have not yielded satisfactory results, or have been considered and, in the judgment of the investigators, relying on their training and experience, rejected as being impractical, unlikely to succeed, or too dangerous. Ex. 2 at 65-93; Ex. 3 at 69-97. The affidavits examined the relative utility or fruitfulness of undercover agents, confidential informants, physical surveillance, social media, telephone records and pen registers, prior and/or ongoing TIII interceptions, the grand jury process, search warrants and

15

arrest warrants, seizures, mail covers, trash searches, and financial investigation techniques.

The defendant complains that the necessity portion of the affidavits is boilerplate and repetitive of earlier affidavits in the same case. First, while some of the necessity sections in the affidavits consists of an explication of the limitations and obstacles of the particular investigative technique based on the affiant's training and experience, much of the text of these sections consists of specific facts about this investigation and how the techniques fit into the context of this case. In any TIII affidavit, the affiant must explain to the Court what techniques are available and how and why they might be limited under the circumstances. But here, the affiant also set forth specific facts to support each averment. For example, the Physical Surveillance section alone includes over three pages describing specific examples of surveillance efforts related to the targets of this investigation. *See* Ex. 2 at 75-79. Likewise, the affiant set forth specific reasons why the confidential informants whose information was used in this investigation could only do so much. Ex. 2 at 71-74. The affiant stated he was unable to locate any of the target subjects on social media websites; that was a true statement of fact with respect to this particular investigation. Ex. 2 at 79-80.

Further, the defendant's contention that somehow these affidavits are flawed because they repeated information about necessity from previous affidavits in the same investigation lacks any merit. The affiant was describing the same investigation each time; it had not changed in its basic nature and structure merely because a month had passed.

None of the defendant's arguments change the fact that the necessity averments in these affidavits satisfy the statutory requirements, meet the standard set in the case law of the Third Circuit and other courts, and satisfied Judge Mannion that these wiretaps were sufficiently necessary to merit authorization. Judge Mannion had a substantial basis, relying on the factual averments made by the affiant, on which to make his determination, and therefore this Court should not disturb that determination.

(Doc. 265 at 13-16.)

The Government provided the detailed analysis set out above in response to

Defendant's vague and conclusory assertions regarding necessity (Doc. 252 at 9-10). The

Court has reviewed the Government's citations to the Affidavit of Task Force Officer Thomas Koluzny in support of the wiretap applications and finds them to be accurate, relevant, and probative of the necessity issue. Evidence presented at the suppression hearing buttressed the Government's written argument, particularly testimony concerning the objectives of the investigation which Mr. Koluzny said were "to disrupt the organization, to arrest the conspiracy" and the problem with achieving those goals in this case with normal investigative procedures. (April 4, 2019, Unofficial Hearing Transcript "Tr. 2" at 52-54.) A review of the assertions set out in Mr. Koluzny's January 23, 2017, Affidavit in support of the need for interception (Def.'s Ex. 1, Aff. 70-92) shows that he provided evidence that normal investigative techniques either had not succeeded or reasonably appeared unlikely to succeed if tried given the goals and objectives of the investigation. *See* 18 U.S.C. § 2518(3)(c). The Affidavit provided Judge Mannion with a "'factual predicate' sufficient to inform [him] why other methods of investigation [were] not sufficient." *McGlory*, 968 F.2d at 345 (quoting *Armocida*, 515 F.2d at 38). Mr. Koluzny's affirmations were based in part on his experience as a specially trained agent. *Williams*, 124 F.3d at 418. Thus, pursuant to the "practical and commonsense" test of the Government's necessity allegations, *McGlory*, 968 F.2d at 345, the Court concludes the requisite showing of necessity has been made and Defendant's motion to suppress evidence related to the wiretaps is properly denied.

In making this determination, the Court notes that Defendant does not discuss the wiretap issue at all in his reply brief. (*See* Doc. 272.) Though the Government bears the burden of showing the necessity for the wiretaps, Defendant has not rebutted the evidence presented in the Government's brief nor presented any argument based on testimony presented at the evidentiary hearing.

Having concluded Defendant's necessity allegation argument does not present a basis for suppression of wiretap evidence, the Court now turns to Defendant's argument that evidence from the wiretaps must be suppressed because the authorizations underlying the wiretaps were defective. (Doc. 252 at 11.) Defendant specifically asserts that AUSA Camoni was allegedly authorized to conduct the intercepts but the authorizing forms contain stamps rather than signatures. (Doc. 252 at 11.) Although the Government disputes the basic premise that a stamped signature would invalidate the authorization (Doc. 265 at 17), the Government refutes the assertion that the authorization forms contain stamps with evidence that they were signed. (Doc. 265 at 16-17.) Defendant does not refute this evidence. (*See* Doc. 272.) On the basis of the record presented and the parties' arguments, the Court concludes the Government has satisfied its burden of showing wiretap evidence need not be suppressed on the grounds alleged.

## 2.     *Motion to Suppress Evidence Seized from Residence*

Defendant presents several reasons why the evidence seized at 1137 Grove Street must be suppressed, alleging that the search was unlawful under the Fourth Amendment for

the following reasons: 1) the search warrant used to search the residence was not supported by probable cause; 2) "[t]o the extent that probable cause supported the warrant, that probable cause was based on the fruit of the poisonous tree of prior unlawful wiretaps against Defendant"; 3) the information used to establish probable cause for the search was stale; and 4) the search warrant was insufficiently specific as to the location to be searched. (Doc. 251 at 8.)   Defendant's claimed errors indicate that he raises two separate constitutional issues, "one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (citing *Dalia v. United States,* 441 U.S. 238, 258 (1979)).  As in *Garrison*, the Court will discuss each separately.

a.    **Validity of the Warrant**

Defendant challenges the validity of the warrant on three bases: 1) information from the wiretaps must be suppressed and, without that evidence, no probable cause existed for the issuance of the warrant; 2) information used to establish probable cause was stale; and 3) the warrant lacked adequate information regarding the place to be searched.  (Doc. 252 at 1-13.)  As stated in *Ritter,* "[a] part from requiring probable cause, the warrant clause of the Fourth Amendment also unambiguously requires that warrants must particularly describe 'the place to be searched, and the persons or things to be seized.'"  416 F.3d at 264-65 (quoting U.S. Const. amend. IV).  Of Defendant's validity challenges, the first two relate to probable cause and the third to the Fourth Amendment's particularity requirement.

i.     **Probable Cause**

Although Defendant challenges probable cause on two bases, the Court's determination that the wiretaps in question were not unlawful, *see supra* p. 18, eliminates Defendant's argument that, without wiretap evidence, there was no probable cause for the issuance of the warrant (Doc. 252 at 8). Because the finding that wiretap evidence is admissible eliminates Defendant's "fruit of the poisonous tree" theory (*id.*), the Court's discussion of probable cause is limited to Defendant's claim that the search warrant is not based on probable cause because it relied on stale information (Doc. 252 at 5-8). The Government refutes Defendant's staleness claim based on the fact the investigation involved a narcotics conspiracy and the affidavit contained sufficient evidence for the issuing magistrate judge to find probable cause. (Doc. 265 at 27-31.)

The Fourth Amendment provides the following:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. While the threshold requirement for issuance of a warrant is probable cause, the review of a magistrate judge's initial probable cause determination is deferential based on the historic preference of courts for the warrant process. *Ritter*, 416 F.3d at 261-62 (citing *Johnson v. United States*, 333 U.S. 10, 13-14 (1948); *United States v. Conley*, 4 F.3d 1200, 1204 (3d Cir. 1993)). *Ritter* described the standard to be "whether the

magistrate had a 'substantial basis' for concluding that probable cause was present." 416

F.3d at 262 (quoting *Illinois v. Gates,* 462 U.S. 213, 236 (1983)).

*Ritter* also identified the relevant legal framework for consideration of an affidavit:

> *Gates* requires that a court considering the sufficiency of an agent's affidavit
> look at the "totality of the circumstances," and, in employing this flexible
> standard, the Supreme Court has explained that the "task of the issuing
> magistrate is simply to make a practical, common-sense decision whether,
> given all the circumstances set forth in the affidavit before him, including the
> 'veracity' and 'basis of knowledge' of persons supplying hearsay information,
> there is a fair probability that contraband or evidence of a crime will be found in
> a particular place." [462 U.S.] at 238–39 (citations omitted). In other words, an
> issuing court need only conclude that it would be reasonable to seek the
> sought-after objects in the place designated in the affidavit; a court need not
> determine that the evidence is in fact on the premises. *See Conley,* 4 F.3d at
> 1205 ("Keeping in mind that the task of the issuing magistrate is simply to
> determine whether there is a 'fair probability that contraband or evidence of a
> crime will be found in a particular place' ... a reviewing court is to uphold the
> warrant as long as there is a substantial basis for a fair probability that evidence
> will be found.") (quoting *Gates,* 462 U.S. at 238).

*Ritter*, 416 F.3d at 262-63.

The Third Circuit Court of Appeals noted "[i]t is well settled that '[a]ge of the

information supporting a warrant application is a factor in determining probable

cause." *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002) (quoting *United

States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)). *Zimmerman* further quoted *Harvey* as

follows:

> "If too old, the information is stale, and probable cause may no longer
> exist. *McNeese,* 901 F.2d at 596. Age alone, however, does not determine
> staleness ... Rather, we must also examine the nature of the crime and the type
> of evidence. *See United States v. Tehfe,* 722 F.2d 1114, 1119 (3d
> Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154

(1984); *Forsythe,* 560 F.2d at 1132; *see also United States v. McCall,* 740 F.2d 1331, 1335–36 (4th Cir.1984)." *Harvey,* 2 F.3d at 1322.

*Zimmerman,* 277 F.3d at 434.

Defendant specifically contends the information used to obtain the warrant was stale because "it predated the search warrant by three weeks and was only relevant to a small timeframe." (Doc. 252 at 6.) Defendant identifies three pieces of information in the warrant application "that tend[ ] to indicate that the residence was utilized in the drug trade" and his staleness argument is based on this evidence. (Doc. 252 at 6.) He identifies the following information:

> Defendant's first appearance in the factual recitation of the case in the warrant application occurs on December 4, 2016, when he is identified in wiretapped calls as a potential source of drugs. (Exhibit 1 at Bates # 257 ¶ 38). The next mention of Defendant is that on January 23, 2017, officers obtained a wiretap of Defendant's phone, and this wiretap resulted in information tending to show that Defendant was dealing narcotics. (Exhibit 1 at Bates # 258 ¶ 39). Next, on February 15, 2017, officers wiretapped a call indicating that drugs were currently present at Defendant's residence. (Exhibit 1 at Bates ## 43-44).

(Doc. 252 at 6.) While Defendant recognizes that caselaw exists to support the proposition that information related to drug conspiracies remains relevant longer, he asserts, without argument or citation, that this is not such a case.[4] (Doc. 252 at 7.)

In response to Defendant's argument, the Government first notes that "Defendant cites no authority, neither case law nor statute, to support this argument, and, more

---

[4] In the staleness section of his brief, Defendant conclusorily raises issues that may go to sufficiency and accuracy of information provided in the affidavit (*see* Doc. 252 at 7-8), but they are matters not related to staleness and not before the Court with the pending motion.

importantly, misstates the recency of the information in the affidavit." (Doc. 254 at 27.) In

contrast, the Government cites authority relevant to the staleness issue in the context of a

drug conspiracy and cites pertinent facts of record in support of the general proposition that

"[i]t is clear from the affidavit that the Magistrate Judge had a substantial basis upon which

to conclude that probable cause existed." (Doc. 265 (citing Ex. 4 at 10-32).) Authority cited

includes the following:

> "[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005) (internal citations omitted). The protracted and continuous nature of narcotics operations extends the shelf life of information in determining staleness. *See United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983). *See e.g.*, *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005) (upholding a finding of probable cause based on observation of narcotics activity that occurred seven months earlier because the later search involved a similar type of narcotics offense); *United States Case v. Filiberto*, 712 F. Supp. 482, 486 (E.D. Pa. 1989) (finding that information obtained two years prior to arrest was not stale in light of the continuous nature of the narcotics trafficking alleged in the affidavit); *United States v. Thompson*, No. 1:11-CR-0077-02, 2013 U.S. Dist. LEXIS 21054, at *18 (M.D. Pa. Feb. 15, 2013) ("stale information is less of a concern when the criminal activity is protracted and continuous, such as in a drug trafficking conspiracy"); *United States v. Scott*, No. 10-cr-677, 2011 U.S. Dist. LEXIS 41633, at *45-48 (E.D. Pa. Apr. 15, 2011) (intercepted calls four months old are not stale given protracted and continuous nature of drug activities of the defendant).

> "In this context, the Third Circuit has observed that 'intervals of weeks or months' between the acts described and the warrant application may not necessarily render evidence stale when other variables support a finding of probable cause." *United States v. Gallo*, 110 F. App'x 265, 268-69 (3d Cir. 2004) (nonprecedential); *see also United States v. Martinez-Osoria*, No. 1:15-CR-153, 2016 U.S. Dist. LEXIS 8, at *7 (M.D. Pa. Jan. 4, 2016).

(Doc. 265 at 28-29.)

The Government identifies the following specific information contained in the search warrant affidavit: 1) three intercepted calls from two dates, February 12 and February 15, not from a single date as defendant claims (Doc. 265 at 30 (citing Doc. 252. at 6; Ex. 2 at 13-29)); 2) the affidavit states that on both March 9 and March 10, the date of the issuance of the search warrant, the defendant's Acura was parked at the residence (*id.* (citing Ex. 2 at 29, ¶ 46)); 3) the affidavit describes 1137 as "a location in which ROMAN-POLANCO is known to frequent" (*id.* (citing Ex. 2 at 19, ¶ 47)); and 4) the affidavit states that on March 10, 2017, the date of the search warrant, intercepted wire and electronic communications revealed that Polanco and a co-conspirator were travelling to New York to obtain heroin (*id.*).

The Court concludes the Government has satisfied its burden of showing that suppression of evidence is not warranted based on staleness of information contained in the warrant.[5] As the Government asserts and the facts of record show, Defendant was charged as part of a wide-ranging conspiracy with large amounts of drugs. (*See, e.g.*, Doc. 265 at 10.) In this context, the Circuit Court has found the passage of time loses significance. *Urban*, 404 F.3d at 774; *Tehfe*, 722 F.2d 1114 at 1119. Given that courts have found that an interval far longer than three weeks between the date of when information was obtained

---

[5] Defendant does not refute the Government's argument or cited evidence in his reply brief. (*See* Doc. 272.)

and the date it was used as a basis for finding probable cause has been found acceptable given the continuous nature of drug trafficking, *see*, *e.g.*, *Filiberto*, 712 F. Supp. at 486, the interval at issue here does not invalidate the evidence relied upon. Further, this is a case where "intervals of weeks or months between the acts described and the warrant application" would not render evidence stale because other variables, such as identification of drug-related activity taking place on the date of the warrant application, support a finding of probable cause." *Gallo*, 110 F. App'x at 268-69.

The foregoing discussion indicates that Defendant's probable cause challenges to the warrant fail. Therefore, there is no basis to conclude that evidence related to the warrant must be suppressed on the basis of a lack of probable cause in the issuance of the warrant.

### ii.    Particularity

Defendant cites *Ritter* for the proposition that "[t]he particularity requirement mandates that warrants for apartments and/or apartment houses specifically delineate which unit is to be searched – rather than a general listing for the entire structure." (Doc. 252 at 2 (citing 416 F.3d at 264-67).) Based on this authority, Defendant asserts that evidence which resulted from the execution of the warrant and application in support of it are defective because they are silent as to the floor of the house to be searched and 1137 Grove Street was an apartment house with multiple dwelling units. *(Id.* at 2-3). The Government responds that the warrant was valid on its face because the investigators did

not know, nor should they have known, that the house had more than one unit. (Doc. 265 at 19-20.)

In *Garrison*, the United States Supreme Court addressed the issue of a warrant's particularity, noting first that

> [t]he Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized." The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. Thus, the scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found.

480 U.S. at 84 (internal quotation omitted).

In the factual scenario presented in *Garrison*, Baltimore police officers obtained and executed a warrant to search the person of Lawrence McWebb and "the premises known as 2036 Park Avenue third floor apartment." 480 U.S. at 81. When the police applied for the warrant and when they conducted the search pursuant to the warrant, they reasonably believed that there was only one apartment on the premises described in the warrant but, in fact, the third floor was divided into two apartments, one occupied by McWebb and one occupied by Garrison. *Id.* Before the officers executing the warrant became aware that they were in a separate apartment occupied by Garrison, they had discovered the contraband that provided the basis for Garrison's conviction for violating Maryland's

Controlled Substances Act. *Id.* The question presented to the Court was whether the

seizure of that contraband was prohibited by the Fourth Amendment. *Id.*

In this context, the Court stated that

with the benefit of hindsight . . . , we now know that the description of that place was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue. The question is whether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan.

Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant.

. . . [I]t . . . [is] clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.

480 U.S. at 85.

Thus, the question of the validity of the warrant here is based on whether the officers

knew or should have known that 1137 Grove Street contained more than one unit when

they sought the warrant on March 10, 2017. Defendant contends the officers knew or

should have known that the structure contained more than one unit because there were two

entrances to the residence as shown by the photograph attached to the warrant

application.[6]  (Doc. 252 at 3 (citing Doc. 251, Ex. 1 at Bates # 240).)  While Defendant argues this photograph alone shows the warrant is defective, he also asserts that, if the Court determines the photo to be unclear as to showing a building with two residences, the Court must look to what the officers knew at the time they sought the warrant.  (*Id.*)

Consistent with the legal framework set out above, the Government posits that "if the investigators did not know, and had exercised due diligence and still not discovered, that the house had more than one unit, then the warrant is valid on its face as issued."  (Doc. 265 at 19.)  In response to Defendant's assertion that the existence of two doors supports the proposition that investigators knew or should have known that the house had multiple units, the Government contends his argument fails when assessed from a commonsense perspective.  (*Id.* at 20.)  Specifically, the Government states that "the existence of two doors, both facing front, one on the forward-most porch, and one on the side porch" is not evidence of multiple units given that "most single-family homes in the Middle District of Pennsylvania have multiple entrance doors. Some have front doors and side doors. The existence of multiple doors is not dispositive evidence—or evidence at all—that a structure contains multiple units."  (*Id.*)  The Government further asserts that "the unit that was ultimately searched was not reached by either of the front doors, so the defendant's argument is irrelevant to the analysis.  The structure looks like a single-family home from

---

[6] Testimony established that the photograph attached to the Warrant Application came from an online website like Google Maps.  (Tr.2 at 16.)

the outside; it is not an obvious apartment building. Aside from the existence of two doors, Polanco sets forth no facts to support his claim." (*Id.*)

The Court agrees with this assessment. Further, considering evidence presented by TFO Kaluzny at the suppression hearing, the Court concurs with the Government that investigators had no reason to believe, before entering the house, that it contained multiple units. (Doc. 265 at 20.) TFO Kaluzny testified Polanco was the only person who entered or exited the house, the address came back without unit or apartment numbers in every search conducted, the only car that appears to have been registered to the address was Polanco's, otherwise database searches of vehicles parked near the house did not come back to 1137 Grove Street, search of public record databases did not show that anyone else lived at the address, records showed that Defendant's phone was registered to 1137 Grove Street with no apartment or unit identification, and nothing in the wiretap interceptions revealed that anyone else lived at the location. (Tr. 2 at 12-15.) TFO Koluzny also testified that surveillance of 1137 Grove Street was difficult and had to be conducted from a distance and by quick drive-bys because of the character of the neighborhood, adding that some surveillance information was obtained with the use of binoculars. (Tr. 2 at 10-11, 40.) TFO Koluzny testified that he never saw anyone use either of the doors depicted in the photograph upon which Defendant relied and Defendanat was observed using only the rear door of the house. (Tr. 2 at 12, 17.) In response to questions from the Government's attorney, TFO Koluzny confirmed that, as a result of observation and information uncovered

through research, he never believed 1137 Grove Street to be a multi-unit structure. (Tr. 2 at 17-18.)

In his cross-examination, Defendant's counsel directed TFO Koluzny's attention to a photograph taken of 1137 Grove Street showing two mailboxes and one doorbell near a door. (Tr. 2 at 31 (showing Def.'s Ex. 1).) When asked if that was an accurate depiction of the property on in March 2017, TFO Koluzny responded that he knew there were two mailboxes there today but on March 10, 2017, he did not realize that. (Tr. 2 at 31-32.) In his reply brief, Defendant does not delineate the issues of the warrant's validity with its execution, but he again points to the existence of two mailboxes as an indication that the residence consisted of two separate dwellings. (Doc. 272 at 2.)

The Court concludes evidence of record supports the Government's contention that investigators in this case did not have information that should have led them to conclude that 1137 Grove Street was a multi-unit structure. Defendant's counsel does not present evidence which undermines the testimony of TFO Koluzny, nor does he otherwise point to facts which would have or should have warranted a contrary conclusion at the time the warrant affidavit was sworn. The existence of two mailboxes does not undermine information gained from surveillance and research in that TFO Koluzny testified that he did not see the two mailboxes when he surveilled the house and he did not notice them on the

Google Earth picture which he used for the warrant application.[7]  (Tr. 2 at 52.)   Other courts

have found that the existence of two mailboxes was not sufficient to put investigators on

notice that more than one unit existed where the exterior of the structures did not reveal the

interior configuration.  *United States v. Brooks*, 294 F. App'x 71, 73 (4th Cir. 2008); *United*

*States v. Rios*, No. 09-CR-245, 2010 WL 1529435, at * 5 (E.D. Wis. Feb. 12, 2010).  *Brooks*

described circumstances similar to those presented here in that the investigator's physical

assessment indicated a single-family residence and drive-by surveillance was at a distance

to avoid detection.  294 F. App'x at 73.

Given the requisite commonsense analysis of what the investigators knew and

should have known at the time the warrant application was submitted, the Court concludes

the original warrant was valid based on the information that officers disclosed and had a

duty to disclose to the magistrate judge.  *See Garrison*, 480 U.S. at 85.  In so finding, the

Court is guided by *Ritter's* summary regarding the consequences of a search warrant which

was not completely accurate in describing the premises to be searched:

> a search warrant, "insofar as it authorize[s] a search that turn [s] out to be
> ambiguous in scope," will, nevertheless, be upheld against a particularity
> challenge if the warrant described the structure as it was known or should have
> been known to the officers after reasonable inquiry under the circumstances.

*Ritter*, 416 F.3d at 266 (quoting *Garrison,* 480 U.S. at 86).  *Ritter* further supports the

conclusion that, if a court concludes the original warrant was valid based on what the

---

[7] It is not clear whether the photograph offered as Defendant's Exhibit 1 is a blow-up of a portion of the
photograph attached to the warrant application.

officers knew or should have known at the time, evidence found in the search cannot be suppressed on the basis of the alleged defects in the warrant. 416 F.3d at 266. Because the Court concludes the issuance of the warrant was valid, investigators were entitled to use the warrant as a basis for the execution of the search of 1137 Grove Street. *Garrison*, 480 U.S. at 85-86; *Ritter*, 416 F.3d at 265-66. Therefore, the Court will now turn to the final question of whether the execution of the warrant violated the Fourth Amendment and requires suppression of evidence which resulted from the search.

**b.    Reasonableness of the Execution of the Warrant**

Defendant contends the execution of the search warrant was unreasonable because the officers were obligated to stop the search upon realizing that 1137 Grove Street contained multiple residences. (Doc. 252 at 4-5.) He further contends that all evidence seized after the time they realized the structure was not what they had thought it to be must be suppressed. (*Id.* at 5.) The Government disagrees with this analysis on factual and legal grounds. (Doc. 265 at 18-27.)

In analyzing the reasonableness of the manner in which the search warrant was executed, *Garrison* provides the legal relevant framework and valuable guidance regarding the circumstances presented here:

> We have no difficulty concluding that the officers' entry into the third-floor common area was legal; they carried a warrant for those premises, and they were accompanied by McWebb, who provided the key that they used to open the door giving access to the third-floor common area. If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the

32

error in the warrant, they would have been obligated to limit their search to McWebb's apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant. The officers' conduct and the limits of the search were based on the information available as the search proceeded. While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants.

*Garrison*, 480 U.S. at 86–87. *Ritter*, relying on *Garrison*, provided a similar analysis:

if the officers had known, or should have known, that there were separate dwellings contained in the property pictured in [the affidavit], they would have "been obligated to exclude [those areas for which probable cause was not established] from the scope of the requested warrant." 480 U.S. at 85 . . . . [The investigating office] testified that the multi-unit nature of defendants' residence was not known to officers prior to execution of the warrant. Second, mere entry into the building's common areas was reasonable and lawful because the officers carried a valid warrant authorizing entry upon the premises. *Id.* at 86 . . . . As discussed above, the warrant to search defendants' residence was valid and it is undisputed that the warrant was directed specifically toward the property that officers did in fact enter. Third, once the officers knew or should have known of the error in what they encountered versus what was authorized by the warrant, they were obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search. *Id.* at 87..

*Ritter*, 416 F.3d at 266.

Here, all evidence shows that the executing officers did exactly what they should have done pursuant to *Garrison* and *Ritter*. As determined above, the executing officers had a valid search warrant which authorized them to search "1137 Grove Street, Avoca, Pennsylvania 18634 (the residence of Juan V. ROMAN-POLANCO), described as a tan-colored vinyl-sided home with a covered front and side porch." (Doc. 251-1 at 2.)

33

According to TFO Koluzny's testimony, Defendant had been observed using only the door the executing officers entered, i.e., the door at the rear of the structure accessed by exterior stairs. (Tr. 2 at 12-13.) To gain entry into the interior of the structure, the officers went up the stairs depicted in Defendant's Exhibit 3 and, using the key which had been seized from Defendant earlier that day when he had been arrested, unlocked the door off the porch at the top of the stairs and entered Defendant's residence. (Tr. 2 at 23-24, 42.) Once inside the structure, they conducted a security sweep. (Tr. 2 at 24.) In the course of the search, officers realized the area being searched was just the upstairs of the structure, an assessment based on the realization that there was no access from upstairs (where they were) to the downstairs. (Tr. 2 at 26.) They did not search outside the upstairs area to which they had originally gained entry. (*Id.*) TFO Koluzny stated that the officers continued the search after realizing that the upstairs was separate and without access to the downstairs because he knew they were in Defendant's residence based on their surveillance and mail correspondence found in the bedroom of the residence. (Tr. 2 at 26-27.) TFO Koluzny reiterated that the officers never entered the downstairs area of the home or went through any exterior door to the downstairs, including the two doors depicted in the street-side-view photograph attached to the warrant application. (Tr. 2 at 27-28 (citing App. for Search Warrant, Att. A).) The record does not contain any contradictory testimony or evidence regarding the execution of the search.

Given these facts, the Court has no basis to conclude that the officers' search unreasonably exceeded the area allowed in the warrant in that they searched only Defendant's residence. Moreover, consistent with the directives of *Garrison* and *Ritter*, as the officers' search progressed and they realized the structure contained an area not accessible from Defendant's residence, they adhered to the obligation "to exclude [those areas for which probable cause was not established] from the scope of the requested warrant." 480 U.S. at 87; 416 F.3d at 266. Thus, this is not a case where evidence seized during the search must be suppressed—there came no point in time during the search where executing officers searched any area other than Defendant's residence. This is a critical distinction between the facts of this case and those presented in *Garrison* and *Ritter*. As explained in *Ritter*, "similar to the circumstances present in *Garrison*," after entering the premises

> there came a point in the execution of the warrant when the officers "[w]ith the benefit of hindsight [knew] that the description of [the place to be searched] was broader than appropriate because it was based on the mistaken belief that there was only one [dwelling on defendants' property]." *Garrison,* 480 U.S. at 85.

*Ritter,* 416 F.3d at 265. What came after the realization is key: the officers in *Garrison* believed they were in McWebb's apartment and discontinued their search when they realized they were in the wrong apartment (Garrison's), a realization that came after the seizure of contraband, 480 U.S. at 81, and the officers in *Ritter* did not limit or discontinue their search upon discovery of multiple units, 416 F.3d at 266-67. As discussed above,

35

although the executing officers here at some point realized that the structure was divided and there was no access from the area being searched (Defendant's residence) to the downstairs, they were never "put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant," *Garrison*, 480 U.S. at 86, based on their surveillance, access to the area being searched with the use of Defendant's key, and correspondence to Defendant found in the premises being searched. Nor could the officers have been put on such notice since they were not in a unit erroneously included in the warrant.

Finally, the Court finds that Defendant's reply brief (Doc. 272) does not call for a different conclusion. Defendant adheres to his position that the facts of this case are analogous to those in *Ritter* despite the key distinction discussed above. Defendant argues that the Government

> relies on the quote that officers "were required to discontinue the search of
> respondent's apartment as soon as they discovered that there were two
> separate units on the third floor and therefore where but [sic] on notice of the
> risk that they might be in a unit erroneously included within the terms of the
> warrant" *Id.* at 87. The Government misconstrues this quote to stand for the
> proposition that if the officers were actually in the appropriate apartment when
> they realized it was a multi-dwelling residence, they could still continue the
> search. To the contrary, this language signals that the search must stop upon
> realization that the search warrant was overbroad. Certainly, when the officers
> made this realization, they should have returned to the Magistrate. For all they
> knew, they could have been in the wrong dwelling.

(Doc. 272 at 4.)

The legal framework set out above shows that Defendant misconstrues the *Garrison* and *Ritter* analyses, in that both cases clearly authorize the search of areas covered by the warrant, which, from a commonsense perspective in this case, was Defendant's residence. *See, e.g., Garrison*, 480 U.S. at 86-97; *Ritter*, 416 F.3d at 256. In *Garrison*, though confronted with a reality different from what had been known previously, i.e., the existence of more than one unit in the area described in the search warrant, the Court clearly stated that the new reality limited the officers' search to the residence of the individual named in the warrant. 480 U.S. at 86. As determined above, that is exactly what the executing officers did here. Defendant's statement that "[f]or all [the officers] knew, they could have been in the wrong dwelling" (Doc. 272 at 4) ignores the relevant facts cited above.

Defendant also avers that his argument concerning what officers "should have known" regarding the character of 1137 Grove Street is supported by more than the existence of two mailboxes. (Doc. 272 at 4-5.) In support of the averment, Defendant states that

> [p]rior to broaching the door to Defendant's apartment, officers knew the following:
>
> • There were two separate mailboxes on the front of the residence. (See Photograph Exhibits from Evidentiary Hearing).
>
> • They had run registrations on cars outside of the residence, including Defendants' and had some idea who was living in the Residence.
>
> • They knew Defendant had only ever been surveilled going in and out of the second door to the Residence.

- The second door to the Residence – in the rear – led only to an enclosed, indoor stairwell to the second floor.

  - At the top of that stairwell was a separately locked door, indicative of a door to a separate apartment.

Despite this information, Officers forcibly broke down the door. They did not inform the Magistrate of this information. They knew or should have known of the information prior to obtaining the warrant. Therefore, their failure to disclose invalidates the warrant. They knew or should have known before breaching the door to the apartment, and, therefore, they should have stopped and returned to the Magistrate.

(Doc. 272 at 5.)

Defendant's proffered evidence provides no support for his position in that he misstates the record. TFO Koluzny testified that he did *not* know there were two mailboxes on the front of the residence on March 10, 2017, the day the search was conducted. (Tr. 2 at 31-32.) While it is true that investigating officers had run registrations on cars outside of the residence and had "some idea" who was living there, their research had *not* revealed any resident other than Defendant. (Tr. 2 at 17-18.) The fact that investigators had only seen Defendant go in and out the back door does not provide support for a conclusion that officers should have known the structure contained multiple dwelling units in that residents of single unit dwellings often consistently use the back door of their house rather than the front door.

Defendant's statement that the "second door to the Residence – in the rear – led only to an enclosed, indoor stairwell to the second floor" (Doc. 272 at 5) is difficult to reconcile with Defendant's proffered exhibit showing the stairway in that open sky and back

38

porch lattice work is clearly visible from the stairway and the photograph does not show a door at the bottom of the stairway.[8] (*See* Def.'s Ex. 3.) Further, the statement does not reflect TFO Koluzny's testimony regarding the stairs and access to Defendant's residence. TFO Koluzny testified that the stairway led to the elevated back porch and there was an entrance from that back porch into Defendant's residence. (Tr. 2 at 12). He also testified that the door on the raised back porch was the door the executing officers entered on March 10, 2017, to gain access to Defendant's residence, they used the key seized from Defendant to get in, and, once inside, they did not have to go up any further steps to get to the residence. (Tr. 2 at 24-25.) Defendant's counsel did not ask TFO Koluzny about the configuration of the stairway other than to ask if his Exhibit 3 (the photograph of the stairway itself) accurately depicted the steps the officers had walked up to get to Defendant's residence. (Tr. 2 at 42.) TFO Koluzny agreed and, shortly thereafter, Defendant's counsel said "[s]o you're walking up the steps, and you're utilizing a key to get into the back door of the second floor; correct." (*Id.*) TFO Koluzny confirmed counsel's statement. (*Id.*) This testimony not only undermines Defendant's description of the stairs but also calls into

---

[8] Defendant proffered another photograph at the hearing without identifying it by number. (Tr. 2 at 42.) Other than asking TFO Koluzny whether the photograph accurately depicted his observation of the rear of the house, Defendant did not further question TFO Koluzny about the photograph or otherwise elaborate about the area depicted. (*Id.*) The Court assumes this to be Defendant's Exhibit 4, a photograph of the back of the house which shows a raised area enclosed by lattice and a solid door at ground level in the center of the structure. No stairway is visible in the photograph. (*Id.*) In response to Government Counsel's earlier request to "describe that back porch, that back area," TFO Koluzny testified "As I remember it, there was a stairway leading up to the back porch. I remember it being about the width of the house and, maybe, six feet deep." (Tr. 2 at 12.)

question Defendant's statement that there was a "separately locked door" at the top of that stairwell (Doc. 272 at 5) in that the statement incorrectly implies there was a locked door at the bottom of the stairwell and no testimony or photographic evidence supports that conclusion. Further, Defendant's statement that "a separately locked door [is] indicative of a door to a separate apartment" (Doc. 272 at 5) does not pass the commonsense/reality test in that residents who lock their doors generally lock all doors.

Finally, the statement that officers "forcibly broke down the door" (Doc. 272 at 5) is a gross misrepresentation of the facts and consistent uncontroverted testimony presented by TFO Koluzny. TFO Koluzny testified that the officers used the key seized from Defendant to open the back door. (Tr. 2 at 23.) Defendant's counsel confirmed this fact. (Tr. 2 at 42.) No photographic or other evidence suggests that any door was "forcibly broken down."[9]

Thus, the Court concludes Defendant has provided no support for his assertion that all evidence seized from the apartment must be suppressed. (*See* Doc. 272 at 5.) Each of Defendant's enumerated reasons for suppression is without merit. First, his statement that the officers "did not inform the Magistrate of this information" (*id.*) is without legal significance. No identified fact (*see id.*) undermines the information contained in the warrant as to what was known or should have been known at the time the warrant was issued for

---

[9] The Court notes that a bright line exists between portraying facts and testimony in the light most favorable to the client and misrepresenting facts and uncontroverted testimony. This is the line between zealous advocacy and lack of candor to the Court, a line which an attorney is professionally bound to respect.

the reasons discussed in the "Particularity" portion of this Memorandum, *see supra* pp. 25-32.

Second, the Court rejects Defendant's conclusion that based on what the officers "knew or should have known before breaching the door to the apartment, . . . they should have stopped and returned to the Magistrate" (Doc. 272 at 5): the conclusion is not supported by the facts of record, it is based on a demonstrably false assertion of fact regarding the manner of entry into the apartment, and it is based on unsupported assumption. Insofar as "breaching" used in this context means "to make a gap by battering,"[10] Defendant makes an assertion of fact entirely unsupported by the record and totally at odds with the fact that the executing officers entered the apartment by using Defendant's key. *See supra* p. 40. Further, the conclusion assumes either the invalidity of the warrant or that the officers had additional knowledge that the structure contained more than one unit before they entered. Nothing in the record supports either assumption: the Court has determined the warrant was valid, and no evidence shows that additional information became known at the commencement of the warrant execution.

Third, Defendant's statement that the officers "certainly knew when they were in the apartment, and, therefore, should have stopped and returned to the Magistrate" (Doc. 272 at 5) is inaccurate: they realized while they were in ***Defendant's*** apartment that the structure was divided and they searched no other area of the structure—as discussed at

---

[10] *See* https://www.miriam-webster.com/dictionary/breach.

41

length above, *see supra* pp. 32-36, under *Garrison* and *Ritter* the officers properly limited the search to Defendant's residence and, thus, there was no need to return to the magistrate for further authorization.

As the foregoing discussion indicates, the Government has produced evidence which shows that the wiretaps, issuance of the search warrant, and execution of the search warrant were reasonable under the Fourth Amendment. Therefore, Defendant's Motion to Suppress Evidence is properly denied.

## C.    *Motion for Early Disclosure of Jencks Act Material*

Defendant moves for early disclosure of Jenck's material given the complexity of the case and number of witnesses and co-conspirators expected to testify at trial. (Doc. 252 at 12.) He seeks disclosure on April 3, 2019. (*Id.* at 13.) The Government responds that the request must be denied based on relevant law. (Doc. 265 at 31-32.) The Court agrees that Defendant is not legally entitled to the disclosure he seeks.

The Court agrees with the relevant law set out by the Government:

> The Jencks Act states: "No statement or report in the possession of the United States which was made by a Government witness … shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a) (emphasis added). The Third Circuit has consistently explained that a district court cannot compel early production of Jencks Act material. *See, e.g., United States v. Higgs*, 713 F.2d 39, 44-45 (3d Cir. 1983); *United States v. Murphy*, 569 F.2d 771, 773 (3d Cir.), cert. denied, 435 U.S. 955 (1978); *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir.), cert. denied, 409 U.S. 914 (1972). As the Circuit stated in *Murphy*: The blunt command of the statute together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of

government witnesses until conclusion of direct examination at the trial. 569 F.2d at 773. *See also United States v. Giampa*, 904 F. Supp. 235, 282 (D.N.J. 1995).

(Doc. 165 at 31-32.)

Defendant points to law relevant to disclosure of material generally. (Doc. 252 at 11-12.) Specific to Jencks material, he points to the following: "'Even when the favorable information takes the form of a witness statement otherwise protected from pretrial discovery by the Jencks Act (18 U.S.C.A. § 3500), the prosecution must nonetheless disclose it as far in advance of trial as due process may practically require for the defense to make fair use of it.'" (Doc. 252 at 12 (quoting *U.S. v. Campagnuolo*, 592 F.2d 852, 859-60 (5th Cir. 1979)).)

The authority cited by both parties leads to only one conclusion: the Court cannot compel early disclosure of Jencks material, but the Government's cooperation in timely disclosure is important to efficient use of the material. Therefore, the Court will deny Defendant's motion and approve the parties' cooperation on the matter of Jencks material.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss Indictment for Violation of Speedy Trial Act (Doc. 253) will be DENIED; Defendant's Motion to Suppress Evidence (Doc. 251) will be DENIED; and Defendant's Motion for Early Disclosure of Jencks

Material (Doc. 251) will be DENIED.   An appropriate Order is filed simultaneously with this

Memorandum Opinion.

Robert D. Mariani
United States District Judge